## CASE NO. 23-1986

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

DERRICK COLEMAN, individually and as Administrator of the Estate of Devonte Coleman; TANGY COLEMAN,

    *Plaintiffs – Appellants,*

v.

NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; KENNETH E. LASSITER, in his individual capacity as Director of Prisons; JOHN AND JANE DOES, employees of the North Carolina Department of Public Safety; BYRON BURT, in his individual capacity; REECO RICHARDSON, in his individual capacity; DEANISE ROYAL, in her individual capacity; BRONNIE MCLAMB, in his individual capacity; JESSICA WARD, in her individual capacity; DANA OLIVER, in her individual capacity; PAULA DIGGS, in her individual capacity; AZENET SALAS, in her individual capacity; CHRISSY TADJOU, Sgt, in her individual capacity; JOE RATLEY, in his individual capacity; EDWARD THOMAS, Warden in his individual capacity; PETER R. BUCHHOLTZ, in his individual capacity; KRISTIE BRAYBOY, Warden, in her individual capacity,

    *Defendants – Appellees.*

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT
OF NORTH CAROLINA

## OPENING BRIEF OF APPELLANTS

F. William DeVore, IV
DEVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, North Carolina 28207
(704) 377-5242

Brittany N. Conner
DEVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, North Carolina 28207
(704) 377-5242

S. Cramer Lewis
DEVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, North Carolina 28207
(704) 377-5242

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. ___23-1986___      Caption: ___Derrick Coleman, et al. v. NC Department of Public Safety, et al.___

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Derrick Coleman___
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ F. William DeVore, IV                    Date:        09/28/2023

Counsel for: Derrick Coleman, Appellant

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1986          Caption: Derrick Coleman, et al. v. NC Department of Public Safety, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Tangy Coleman
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.  Does party/amicus have any parent corporations?    ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ F. William DeVore, IV    Date: 09/28/2023

Counsel for: Tangy Coleman, Appellant

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. IV

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF ISSUES ................................................................... 1

STATEMENT OF CASE ...................................................................... 2

STATEMENT OF THE FACTS ............................................................ 3

SUMMARY OF ARGUMENT .............................................................. 7

STANDARD OF REVIEW .................................................................... 9

ARGUMENT ...................................................................................... 10

I.  THE DISTRICT COURT ERRED BY FAILING TO CONSIDER WHETHER PLAINTIFFS' CLAIMS AGAINST NCDPS COULD PROCEED DIRECTLY UNDER THE NORTH CAROLINA CONSTITUTION. ................................... 10

   *A. Devonte's state constitutional rights were violated because Defendants' obstruction of justice and conversion of Devonte's property constituted cruel or unusual punishment under the North Carolina Constitution.* ........................................................ 11

i

   1.  NCDPS obstructed justice..........................................................11

   2.  NCDPS converted Devonte's property....................................15

   3.  Obstructing justice and converting Devonte's property
constituted cruel or unusual punishment under the North Carolina
Constitution. ......................................................................................16

  B.  *Plaintiffs had no adequate remedy at state law.*..........................*19*

II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON
DEVONTE'S CONDITIONS OF CONFINEMENT CLAIM UNDER THE EIGHTH
AMENDMENT. ......................................................................................22

  A.  *The deprivation that Devonte was subjected to was severe enough
to reach objective constitutional dimensions.*...................................*23*

   1.  Devonte suffered a serious or significant physical or emotional
injury...................................................................................................23

   2.  Under the totality of the circumstances, Devonte was deprived
of basic human needs. ........................................................................26

  B.  *Plaintiffs forecasted sufficient evidence that Defendants were
deliberately indifferent.*.....................................................................*38*

   C.   *The policies or actions of the individual Defendants inflicted pain without penological purpose.* ............................................................. *40*

III.   THE DISTRICT COURT ERRED IN RULING THAT THE DEFENDANTS WERE ENTITLED TO QUALIFIED IMMUNITY. ...........................................44

CONCLUSION .........................................................................................48

STATEMENT REGARDING ORAL ARGUMENT..............................49

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ...................................................................35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986). ...........................................................10, 33

*Batton v. North Carolina*,
501 F.Supp. 1173 (E.D.N.C. 1980)........................................27

*Brosseau v. Haugen*,
543 U.S. 194 (2004) ...................................................................33

*Brown v. Plata*,
563 U.S. 493 (2011) ...................................................................26

*Camreta v. Greene*,
563 U.S. 731 (2011) ...................................................................48

*Clay v. Miller*,
626 F.2d 345 (4th Cir. 1980)....................................................27

*Colburn v. Upper Darby Twp.*,
946 F.2d 1017 (3d Cir. 1991)...................................................48

*Copper v. Denlinger*,
363 N.C. 784 (2010).................................................................20

*Corum v. University of North Carolina*,
330 N.C. 761 (1992)........................................................................10, 17

*Craig v. New Hanover Cty. Bd. of Educ.*,
363 N.C. 334 (2009)..............................................................................20

*Estelle v. Gamble*,
429 U.S. 97 (1976) ...................................................................22, 34, 40

*Farmer v. Brennan*,
511 U.S. 825 (1994) ......................................................................passim

*Gen. Ins. Co. of Am. v. U.S. Fire Ins. Co.*,
886 F.3d 346 (4th Cir. 2018)................................................................10

*Grant v. High Point Regional Health System*,
184 N.C. App. 250 (2007)..............................................................12, 14

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ..............................................................................44

*Harper v. Showers*,
174 F.3d 716, 720 (5th Cir. 1999)........................................................36

*Helling v. McKinney*,
509 U.S. 25 (1993) ................................................................................23

*Hope v. Pelzer*,
536 U.S. 730, 738 (2002) ..................................................31, 44, 45, 48

*Hudson v. McMillian*,
   503 U.S. 1 (1992) ........................................................... 23

*Hudson v. Palmer*,
   468 U.S. 517 (1984). ...................................................... 22

*In re Kivett*,
   309 N.C. 635 (1983) ................................................ 11, 12

*Jackson v. Lightsey*,
   775 F.3d 170 (4th Cir. 2014) .......................................... 38

*Johnson v. Levine*,
   588 F.2d 1378 (4th Cir. 1978) ........................................ 27

*Jones v. Solomon*,
   90 F.4th 198 (4th Cir. 2024) .......................................... 26

*Jordan v. Gardner*,
   986 F.2d 1521 (9th Cir. 1993) .................................... 28, 31

*Karn v. PTS of America, LLC*,
   590 F.Supp. 3d 780 (D.Md. 2022) .............................. 32, 40

*Kirby v. Blackledge*,
   530 F.2d 583 (4th Cir. 1976) .......................................... 27

*LaFaut v. Smith*,
   834 F.2d 389 (4th Cir. 1987) .................................... 28, 32

*Lee v. Downs*,
  641 F.2d 1117 (4th Cir. 1981)...............................................................32

*Madey v. Duke University*,
  336 F.Supp.2d 583 (M.D.N.C. 2004)....................................................15

*Norman v. Taylor*,
  25 F.3d 1259 (4th Cir. 1994)................................................................24

*Rhodes v. Chapman*,
  452 U.S. 337 (1981) ..............................................................26, 40, 47

*Rish v. Johnson*,
  131 F.3d 1092 (4th Cir. 1997)..............................................................23

*Salem v. U.S. Lines Co.*,
  370 U.S. 31 (1962) ...............................................................................25

*Scinto v. Stansberry*,
  841 F.3d 219 (4th Cir. 2016)..........................................................25, 26

*Spain v. Procunier*,
  600 F.2d 189 (9th Cir. 1979)...............................................................44

*Spinks v. Taylor*,
  303 N.C. 256 (1981)..............................................................................15

*State v. Kelliher*,
  381 N.C. 558 (2022)..............................................................................17

*Strickler v. Waters*,
  989 F.2d 1375 (4th Cir. 1993)...............................................23

*Tafari v. McCarthy*,
  714 F.Supp. 2d 317 (N.D.N.Y. 2010)...................................36

*Taylor v. Wake County*,
  258 N.C. App 178 (2018)..............................................10, 20

*Thompson v. Virginia*,
  878 F.3d 89 (4th Cir. 2017).............................................44, 45

*Thorpe v. Clarke*,
  37 F.4th 926 (4th Cir. 2022)............................................45, 47

*U.S. v. Whedbee*,
  964 F.2d 330 (4th Cir. 1992)...............................................15

*United States ex rel. Bracey v. Rundle*,
  368 F.Supp. 1186 (E.D.Pa. 1973).......................................28

*United States v. Ancient Coin Collectors Guild*,
  899 F.3d 295 (4th Cir. 2018)...............................................9

*Wilcox v. City of Asheville*,
  222 N.C. App. 285 (2012)..................................................20

*Wilkerson v. Stalder*,
  639 F.Supp. 2d 654 (M.D. La. 2007)...................................25

*Williams v. Benjamin*,
  77 F.3d 756 (4th Cir. 1996) .................................................................24

*Wilson v. Johnson*,
  385 Fed. Appx. 319 (4th Cir. 2010) .....................................................34

*Wilson v. Seiter*,
  501 U.S. 294 (1991) .............................................................................28

## Statutes

28 U.S.C. § 1367 ......................................................................................1

28 U.S.C. §1331 .......................................................................................1

42 U.S.C. § 1983 ...................................................................................1, 2

## Constitutional Provisions

N.C. Const. Art. I, § 35 ..........................................................................15

N.C. Const. Art. XI, § 2 .................................................................... 15, 16

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this lawsuit under 28 U.S.C. §1331 because Plaintiffs asserted three claims for relief pursuant to 42 U.S.C. § 1983. JA038-049. The district court had supplemental jurisdiction over the remaining state-law tort claims pursuant to 28 U.S.C. § 1367 because the federal and state claims arose out of a common nucleus of operative fact.

This Court has appellate jurisdiction because the district court's Order granting summary judgment to Defendants on all of Plaintiffs' claims was a final order, and Plaintiffs' Notice of Appeal was timely filed within 30 days after the Order was entered by the Honorable Max O. Cogburn Jr., United States District Judge, pursuant to Rule 4 of the Federal Rules of Appellate Procedure. JA274-276.

# STATEMENT OF ISSUES

1.     Did the district court err by failing to consider whether Plaintiffs' Claims Against NCDPS for Obstruction of Justice and Conversion may Proceed Directly under the North Carolina Constitution where Devonte's state constitutional rights were violated, and Plaintiffs had no adequate remedy at state law due to the operation of sovereign immunity?

2.     Under the Eighth Amendment, which prohibits cruel and unusual punishments, did the district court err in granting summary judgment to Defendants on Plaintiffs' conditions of confinement claims where the severity of the deprivation reached objective constitutional dimensions, the Defendants were deliberately indifferent, and the Defendants inflicted pain without penological purpose?

3.     Under Federal Common Law, did the district court err in holding that the Defendants were entitled to qualified immunity where Devonte's rights were clearly established, and Defendants were deliberately indifferent?

## STATEMENT OF CASE

The basis of this lawsuit concerns the inhumane treatment of Devonte Coleman ("Devonte"), an inmate confined by the state of North Carolina, while he was hospitalized and receiving medical treatment for a terminal condition during June, July, and August of 2018. JA031. Plaintiffs alleged violations of the North Carolina Constitution, violations of the Eighth Amendment pursuant to 42 U.S.C. § 1983, negligence, conversion, intentional infliction of emotional distress, obstruction of justice, and punitive damages due to the treatment that Devonte received at the hands of the individual guards posted to his hospital room and pursuant to official policy of the North Carolina Department of Public Safety ("NCDPS"). JA038-049.

Plaintiffs originally filed this action on September 1, 2020, in Mecklenburg Superior Court, naming five Defendants and various John and Jane Does. JA020. On October 16, 2020, Defendants removed the case to the federal district court. JA017-019. On April 6, 2021, Plaintiffs filed their First Amended Complaint, adding ten Defendants. JA008, JA241. On November 10, 2021, Plaintiffs filed their Second Amended Complaint, adding three new Defendants. JA010, JA027, JA241. The collective Defendants filed their motion for summary judgment as to all of Plaintiffs' claims on September 27, 2022. JA013. The district court held a hearing on January 18, 2023. JA015. On August 24, 2023, the district court granted the Defendants' motion for summary judgment. JA015. This appeal timely followed the district court's final Order. JA015, JA276.

## STATEMENT OF THE FACTS

On April 18, 2017, 20-year-old Devonte Coleman was convicted in Iredell County, North Carolina of conspiracy and was sentenced to a maximum term of three years, eleven months. JA054. At some point during his incarceration, Devonte contracted mucormycosis rhinosinusitis, a rare and deadly fungal disease affecting his face, brain, organs, requiring multiple surgeries, causing severe pain, and ultimately causing his death. JA022, JA261, JA500-501.

Devonte's illness progressed over several months, and in early July 2018, when Devonte was receiving care at Duke Regional Medical Center ("Duke"), doctors noted that the condition was fatal and began palliative care. JA022, JA092, JA200-201, JA323-325, JA500-501, JA508. During his stay at Duke, Devonte's illness and terminal status were well known to the guards assigned to his hospital room; medical staff; Devonte's father, Derrick Coleman; Devonte's stepmother, Tangy Coleman; and NCDPS. JA150, JA170, JA200-203, JA393, JA427, JA429, JA448. During this time, Devonte's terminal medical condition caused him severe facial pain, headaches, nausea, fever, kidney injury, and severe anemia. JA323-325, JA500-501, JA508. Devonte's face was extremely swollen, and his right eye was swollen shut. JA200-201, JA244, JA323-325, JA500. His condition was tremendously painful, requiring substantial pain management. JA323-325, JA500, JA508.

Derrick and Tangy Coleman ("the Colemans") were allowed to visit Devonte at Duke. JA057, JA244. While Devonte was in the hospital throughout June, July, and August of 2018, the Colemans witnessed Devonte being subjected to the following:

> (a) Devonte being forced by guards to urinate in a cup in front of family and guards while chained to his hospital bed despite the availability of an in-room restroom;

4

(b) Devonte being forced by guards to finish his meals quickly and while chained to the hospital bed or else have the meals discarded by guards; and

(c) Devonte being forced by guards to endure the in-room television blared at high volume, depriving him of rest and peace.

JA093-094, JA451-454, JA464-471.

The Colemans requested that the guards discontinue the above behavior and reported the same to agents of NCDPS, including the assistant warden of Central Prison. JA089-090. The Colemans were unable obtain the names of the specific guards subjecting their son to such conditions. JA449, JA459-462. On July 16, 2018, in an effort to identify the guards mistreating their child, the Colemans, through counsel, sent a preservation letter requesting, among other things, that NCDPS provide the names of all guards stationed in Devonte's hospital room. JA387. On or about September 13, 2018 (four days after Devonte's death), the Colemans sent another preservation letter, again requesting the names of the guards who had been stationed in Devonte's room. JA026. These requests were denied by NCDPS, including a denial by Deputy General Counsel Jodi Harrison. JA025, JA204-205.

Without any means to connect the names and faces of the guards whom they witnessed mistreating Devonte, the Colemans were forced in their initial state court pleading to name John and Jane Does for their individual capacity claims against

various guards. JA020. It was not until Plaintiffs were able to take numerous video depositions of guards and show the videos to the Colemans that Derrick and Tangy were finally able to put some faces to names regarding the guards who had mistreated their son nearly four years prior. JA464-471. Derrick and Tangy were able to view the depositions and submit affidavits identifying by name some of the guards that engaged in some specific behaviors. *Id*. Still, the Colemans testified that there were more guards who were never identified. JA454. Based on their viewing of video depositions, Derrick and Tangy were able to finally associate the following individual Defendant guards with the following activities:

- Forcing Devonte to urinate in a cup in front of guards and family while chained to the hospital bed despite the availability of an in-room restroom – *Bronnie McLamb, Byron Burt, Dana Oliver, Deanise Royal, Jessica Ward, Paula Diggs, Azenet Salas*.

- Throwing away Devonte's food if not eaten fast enough while chained to the hospital bed – *Deanise Royal*.

- Overtightening Devonte's restraints – *Bronnie McLamb*.

JA464-471.

Devonte Coleman died on September 9, 2018. JA240. Immediately after Devonte's death, Derrick Coleman requested the return of his son's belongings and written letters that were addressed specifically to the Colemans. JA037, JA245, JA456-457. Despite numerous requests and throughout protracted discovery in this

case, Devonte's belongings, which were in the custody of NCDPS, were never returned. JA413, JA245, JA225.

Throughout Devonte's incarceration, which lasted until August 27, 2018, Devonte never committed any disciplinary infraction involving violent behavior. JA023, JA282-297. Defendants represented to the district court that Devonte had been involved in an assault on another inmate on May 17, 2018. D.E. 71, at 2. However, Devonte's disciplinary record reveals that the alleged assault involved 20 inmates beating up one other inmate for approximately 30 seconds. JA283-292, JA199. According to the NCDPS records, Devonte denied any involvement in this assault, and the inmate who was assaulted also denied that Devonte had been involved. JA294, JA296. Further, on the date of this alleged assault, Devonte was receiving medical care for his fungal infection, which had already begun to progress, causing numbness and pain in his face and head. JA311. Defendants produced video purporting to depict the assault, none of which depicts Devonte being involved in any kind of physical altercation. JA199.

## SUMMARY OF ARGUMENT

The district court erred in three broad ways. First, the district court failed to consider or rule on Plaintiffs' claims under the North Carolina Constitution brought directly against NCDPS. Second, the district court erred by granting summary

judgment to Defendants on Plaintiffs' claims under the Eighth Amendment of the United States Constitution. Third, the district court erred by finding for the Defendants on the issue of qualified immunity.

Under the North Carolina Constitution, which provides broader rights to prisoners than those granted under the Eighth Amendment to the United States Constitution, NCDPS deprived Devonte Coleman of his right to be free from cruel or unusual punishment. NCDPS deprived Devonte of these rights by obstructing justice and converting Devonte's property. Under North Carolina law, a plaintiff seeking relief for state constitutional injuries may do so by stating a claim directly under the North Carolina Constitution when such a plaintiff has no adequate remedy under state law. A plaintiff has no adequate state remedy where sovereign immunity completely bars suit. Because NCDPS deprived Devonte of his state constitutional rights and since Plaintiffs had no adequate state remedy, the district court—which ruled against Plaintiffs' claims for obstruction and conversion solely on sovereign immunity grounds—erred by failing to consider or rule on Plaintiffs' direct claims against NCDPS under the North Carolina Constitution.

In ruling on Plaintiffs' conditions of confinement claim under the Eighth Amendment to the United States Constitution, the district court erred by misapplying the standard for summary judgment to the evidence at bar. Specifically, the district court resolved factual disputes, failed to take facts and inferences in the light most

favorable to the non-moving party, and weighed competing testimony over which reasonable minds could fairly disagree. Plaintiffs forecasted evidence sufficient to allow a reasonable jury to find that Devonte was subjected to an objectively severe risk of injury rising to constitutional dimensions, that Defendants were deliberately indifferent to said risk of injury, and that the Defendants were not entitled to qualified immunity.

To correct these errors, this Court should reverse the granting of summary judgment on Plaintiffs' Eighth Amendment claim, reverse the granting of summary judgment on Plaintiffs' North Carolina Constitutional claim, and remand this case for further proceedings. Specifically, this Court should remand Plaintiffs' state constitutional claims because the exception to sovereign immunity for claims brought directly under the North Carolina Constitution was raised by Plaintiffs but was neither addressed nor ruled on by the district court.

## STANDARD OF REVIEW

The Appellate Court reviews a district court's award of summary judgment *de novo*. *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 312 (4th Cir. 2018). Summary judgment is proper when there are no material disputes of fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In its *de novo* review of a district court's grant of a motion for summary judgment, the

reviewing court construes "all facts and reasonable inferences therefrom in favor of the nonmoving party." *Gen. Ins. Co. of Am. v. U.S. Fire Ins. Co.*, 886 F.3d 346, 353 (4th Cir. 2018). As such, the responding party is entitled to have all reasonable inferences and questions of law resolved in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

# ARGUMENT

## I. The district court erred by failing to consider whether Plaintiffs' claims against NCDPS could proceed directly under the North Carolina Constitution.

Plaintiffs' claims against NCDPS for obstruction of justice and conversion should have been allowed to proceed directly under the North Carolina Constitution.

> A Corum claim allows a plaintiff to recover compensation for a violation of a state constitutional right for which there is either no common law or statutory remedy, or when the common law or statutory remedy that would be available is inaccessible to the plaintiff. By allowing an otherwise common law or statutory claim to proceed as a direct constitutional claim, the North Carolina Supreme Court fashioned an avenue to bypass certain defenses such as sovereign or governmental immunity. A Corum claim is available to a plaintiff who is able to establish that (1) her state constitutional rights have been violated, and (2) she lacks any sort of "adequate state remedy." *Corum v. University of North Carolina*, 330 N.C. 761, 413 S.E.2d 276, cert. Denied, 506 U.S. 985, 113 S.Ct. 493, 121L.Ed.2d 431 (1992).

*Taylor v. Wake County*, 258 N.C. App 178, 183 (2018).

Plaintiffs' claims against NCDPS for obstruction of justice and conversion should be allowed to proceed directly as *Corum* claim(s) against NCDPS because (1) Devonte's state constitutional rights were violated since the obstruction of justice and conversion that occurred constitute cruel or unusual punishment under the North Carolina Constitution—thus, the remedies for obstruction and conversion address the constitutional injury; and (2) Devonte's estate lacked an adequate remedy at law.

### A. Devonte's state constitutional rights were violated because Defendants' obstruction of justice and conversion of Devonte's property constituted cruel or unusual punishment under the North Carolina Constitution.

Under North Carolina common law, NCDPS obstructed justice and converted Devonte's property. In this case, the acts of NCDPS establishing the common law torts of obstruction of justice and conversion also demonstrate violations of Devonte's rights under the North Carolina Constitution to be free from cruel or unusual punishment. As such, Plaintiffs satisfy the first prong for a direct claim under *Corum*.

### 1. NCDPS obstructed justice.

Obstruction of justice is a common law tort in North Carolina that occurs where any act prevents, obstructs, impedes or hinders public or legal justice. *In re Kivett*, 309 N.C. 635, 670 (1983). Obstruction of justice may take a variety of forms.

*Id*. In *Grant v. High Point Regional Health System*, the North Carolina Court of Appeals held that a Plaintiff stated a cause of action for obstruction of justice where the complaint alleged that the Defendant destroyed medical records of the decedent, thereby precluding Plaintiff from obtaining Rule 9(j) certification in the Plaintiff's medical malpractice action. 184 N.C. App. 250, 256 (2007).

Plaintiffs sent preservation letters to NCDPS on or about July 16, 2018, and September 13, 2018. JA026, JA387. NCDPS refused to provide logs or other documentation responsive to Plaintiffs' requests. JA025, JA204-205. It was only after Plaintiffs filed suit that NCDPS began to provide logs. After protracted discovery, NCDPS still failed or refused to produce approximately thirteen days of records identifying which officers were in the room with Devonte and what was done. JA269, JA525.

Various Defendants testified that hospital logs were kept in a binder all together and there would be no reason why certain dates would be lost JA441, JA391, JA430-431, JA436. During their video-recorded depositions, when asked how these logs and this personal property, including Devonte's writings, could have been lost, the guards laughed. JA207. Further, the missing logs mirrored days of missing shift narratives, which was particularly strange because shift narratives and hospital logs were not kept in the same places. JA216.

These failures occurred despite NCDPS' receipt of numerous letters from Plaintiffs' counsel requesting preservation and production of the exact information that NCDPS withheld and inexplicably failed to retain or produce. Importantly, Plaintiffs' counsel informed NCDPS that these deprivations were occurring while Devonte was still alive and while he was actively being mistreated. JA025-026, JA089-090, JA386-387.

Thus, when Derrick and Tangy Coleman, who witnessed their son being mistreated, requested the names of all guards subjecting their son to mistreatment, NCDPS refused to provide that information until after Plaintiffs filed suit, and even then, failed to provide logs for nearly one-sixth of Devonte's entire hospital stay.

Plaintiffs alleged that NCDPS undertook the above conduct in an obvious effort to eliminate Plaintiffs' claims against individual Defendants. JA048-JA049. Derrick and Tangy Coleman were not able to invent the names of the officials who they saw harm their son out of whole cloth. Plaintiffs, thus restricted in their pleadings by Defendants' apparent gamesmanship, were unable to tie numerous NCDPS agents to the inhumane conduct that they witnessed. Tangy and Derrick testified that they did not know the names of various NCDPS agents who hurt their son in their presence. JA189, JA232, JA449-450, JA455, JA459-462. As such, it was not until viewing video depositions of the individual Defendants, which were taken approximately three years after Devonte's stay at Duke, that the Colemans were

finally able to tie names to some of the faces that harmed their son. Still, it is apparent from the deposition testimony of Derrick and Tangy that there were more guards than the individuals named who harmed Devonte in front of his parents. JA189, JA454-455.

Thus, NCDPS used every procedural and sovereign advantage available to it to prevent Plaintiffs from fairly prosecuting their claims. Despite withholding and eventually failing to produce relevant hospital logs, Defendants argued that Plaintiffs could not show deliberate indifference sufficient to maintain an Eighth Amendment claim, because Plaintiffs could not name which Defendants performed certain acts. D.E. 71, at 6. Similar to the Defendants in *Grant*, NCDPS prevented, obstructed, impeded and/or hindered public or legal justice by failing to preserve, produce, and ultimately losing or destroying without any explanation, the records that Plaintiffs needed and that should have been provided in order to prosecute their claims against individual guards. 184 N.C. App. at 255. NCDPS should not be permitted to withhold, lose, or destroy crucial evidence only to turn around and claim that it is entitled to summary judgment due to the absence of that very same evidence, especially considering a preservation letter was sent *while* the alleged conduct was occurring. These acts by definition are obstruction of justice.

## 2. NCDPS converted Devonte's property.

Under North Carolina law, conversion is defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights. *U.S. v. Whedbee*, 964 F.2d 330, 333 (4th Cir. 1992); *Spinks v. Taylor*, 303 N.C. 256, 278 (1981). While conversion necessarily involves an intentional act, the intention need not be wrongful, and even if a defendant rightfully comes into possession of goods, a conversion occurs when the rightful owner demands return of the goods and the defendant refuses. *Madey v. Duke University*, 336 F.Supp.2d 583, 600 (M.D.N.C. 2004).

The district court held that Plaintiffs' conversion claim should be dismissed because Plaintiffs failed to produce evidence that any of the named individual Defendants ever personally possessed Devonte's personal property. JA268. The Court also found that the property "was clearly within the custody of NCDPS at one time, and now it is apparently gone." *Id*. Finally, the Court noted that conversion is an intentional tort requiring intent. JA267.

Immediately following Devonte's death, Derrick Coleman requested his son's belongings. JA456. It is not disputed that NCDPS rightfully came into possession of Devonte's belongings while Devonte was incarcerated. It is also not disputed that NCDPS failed to return any of Devonte's personal belongings to Derrick Coleman

15

following Devonte's release and death, despite the demand that the belongings be returned. Throughout discovery, including over a dozen depositions, no NCDPS employee or agent was able to name any individual who would have been personally responsible for losing or discarding Devonte's belongings. JA206-207. Derrick Coleman testified that Devonte planned for Derrick to have his personal belongings, which included writings that Devonte created while incarcerated. JA456-457. Similar to the destruction of hospital logs, it is unknown whether Devonte's writings would have implicated certain NCDPS employees, and the Court and Plaintiffs will never know because the custodian of that documentation, NCDPS, lost or destroyed it.

Thus, NCDPS was the entity in control and possession of Devonte's personal belongings during all relevant times. NCDPS intentionally came to possess Devonte's belongings. This is all the intent that is required under North Carolina law. Once NCDPS either assumed ownership over Devonte's belongings or altered the condition of said belongings by losing, destroying, or otherwise failing to return them, NCDPS converted the property.

### 3. Obstructing justice and converting Devonte's property constituted cruel or unusual punishment under the North Carolina Constitution.

NCDPS violated Devonte's state constitutional rights by obstructing justice and converting his property. The North Carolina Supreme Court has held that article

I, section 27 of the North Carolina Constitution provides protections distinct from and, depending on context, broader than, those provided under the Eighth Amendment. *State v. Kelliher*, 381 N.C. 558, 579 (2022). Because the Framers of the North Carolina Constitution chose the words "cruel *or* unusual" they intended to prohibit punishment that was *either* cruel *or* unusual—a broader scope than that of the corresponding Federal prohibition. *Id*. Moreover, the North Carolina Supreme Court considers objective indicia of society's standards when exercising its own independent judgment to decide whether punishment is either cruel or unusual. *Id*. 381 N.C. at 581.

Pursuant to *Corum*, courts must "give our [North Carolina] Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to both person and property." 330 N.C. at 783. As such, in exercising independent judgment to assess punishment under article I, section 27, courts must consider features unique to the North Carolina Constitution, including provisions that have no federal counterpart and bear on the interpretation of article I, section 27. *Kelliher*, 381 N.C. at 581. The North Carolina Constitution uniquely and expressly provides that "[t]he object of punishments" in this state is "not only to satisfy justice, but also to reform the offender and thus prevent crime . . . [.]" N.C. Const. Art. XI, § 2. The North Carolina Supreme Court has found that this unique provision bears on the

interpretation of article I, section 27. *Kelliher*, 381 N.C. at 581. Further, the North Carolina Constitution uniquely admonishes that "[a] frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." N.C. Const. Art. I, § 35.

Here, actively preventing a terminally ill inmate from obtaining the identities of officers who were abusing that inmate at the time that the abuse was occurring and despite knowledge that the abuse was occurring, losing or destroying records of the same, and losing or destroying the personal property of that dying inmate constitutes cruel *or* unusual punishment under the North Carolina Constitution.

Both at the summary judgment hearing and in its Order, the district court expressed substantial concern regarding the blatant failures of NCDPS to preserve and produce crucial documentation. JA215-219, JA270 n. 14 ("The Court is deeply troubled by the fact of these missing documents. While the Court would like to allow this [obstruction of justice] claim to go forward, its hands are tied."). The court expressed similar dismay at the failure of NCDPS to return any of Devonte's belongings to his grieving family. JA225-JA228. The court was correct in being "deeply troubled" by the actions of NCDPS. However, the court was mistaken that its hands were tied.

The express objectives of punishment under the North Carolina Constitution are satisfaction of justice and reformation of the offender. N.C. Const. Art. XI, § 2.

The nature of Devonte's crimes did not mean that satisfying justice required such a harsh deprivation of his rights or his ability to vindicate those rights in court. Moreover, satisfaction of justice and preventing crime through offender reformation are objectives that bear no rational relation to converting Devonte's property or preventing Devonte from seeking relief from mistreatment under the law.

NCDPS was aware that Devonte was being mistreated. In addition to allowing the mistreatment to continue, NCDPS undertook a concerted effort to prevent Devonte from obtaining relief under the law. NCDPS denied, delayed, and obstructed Devonte's access to state and federal remedies and discarded his personal property for no identifiable reason except that he was an inmate. Thus, the wrongful actions of NCDPS forming the basis of Plaintiffs' obstruction and conversion claims constitute cruel or unusual punishment under the North Carolina Constitution. As such, the remedies for those wrongs would address the constitutional injury, and the claims should be allowed to proceed directly under the North Carolina Constitution pursuant to the first prong of *Corum*.

### B. Plaintiffs had no adequate remedy at state law.

Plaintiffs lacked an adequate remedy at state law because the claims for obstruction of justice and conversion against NCDPS were completely barred by sovereign immunity. As such, Plaintiffs satisfy the second prong for a direct constitutional claim under *Corum*.

Whether an adequate remedy exists under state law is a two-fold inquiry. *Taylor*, 258 N.C. App. at 185. First, the remedy must address the alleged constitutional injury, *Copper v. Denlinger*, 363 N.C. 784, 688 (2010), and second, the remedy must provide the plaintiff an opportunity to "enter the courthouse doors," *Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 339-40 (2009); *Copper*, 363 N.C. at 789.

An adequate state remedy is not available where a plaintiff's claims against a defendant are barred by sovereign immunity. *Craig*, 363 N.C. at 356-57 (holding that plaintiff's "common law negligence claim [was] not an 'adequate remedy at state law' because it [was] entirely precluded by the application of the doctrine of sovereign immunity."). A remedy is not inadequate simply because a plaintiff may not be able to meet a heightened or different evidentiary burden on the remedy at state law. *Wilcox v. City of Asheville*, 222 N.C. App. 285, 299-300 (2012) (reasoning that "adequacy is found not in success, but in chance[,] and because there was "a genuine issue of material fact as to the applicability of public official immunity," the plaintiff "still ha[d] a chance to obtain relief[,]" regardless of the heightened burden.).

Plaintiffs, in their Brief in Opposition to Summary Judgment, argued:

> [T]o the extent that this Court finds that Plaintiffs' common law claims for Conversion . . . and Obstruction of Justice are barred by sovereign immunity, there is no adequate remedy for the wrongs underlying those claims. The facts establishing those underlying

wrongs evidence violations of the rights guaranteed Devonte under the North Carolina Constitution for which sovereign immunity is no bar because the sovereign itself has guaranteed those rights.

D.E. 74, at 5.

Neither the district court nor the Defendants addressed the above argument. JA240-274. Importantly, the district court dismissed the obstruction and conversion claims against NCDPS on sovereign immunity grounds alone. JA251. The only argument offered by Defendant NCDPS for summary judgment on Plaintiffs' obstruction claim was that "NCDPS is entitled to sovereign immunity on Plaintiff's common law obstruction of justice claim." D.E. 71, at 5. NCDPS did not address Plaintiffs' state constitutional claims against NCDPS. D.E. 71, at 20 (arguing that Plaintiff's state constitutional claim is barred against *individual* defendants).

Plaintiffs lacked an adequate state remedy since the above-described claims against NCDPS were barred by sovereign immunity. This case does not present the situation where Plaintiffs simply could not meet a heightened burden, for instance under governmental immunity. Rather, sovereign immunity completely prevented Plaintiffs from entering the courthouse doors and having a chance to obtain relief on their obstruction and conversion claims. As demonstrated above, Devonte's state constitutional rights were violated by Defendants' obstruction of justice and conversion, and NCDPS made it impossible for Plaintiffs to identify individuals who destroyed the hospital logs or lost Devonte's personal property. Thus, the remedies

for those wrongs would address the constitutional injury. Therefore, Plaintiffs satisfy both prongs under *Corum*, and Plaintiffs' claims for obstruction and conversion should proceed directly against NCDPS under the North Carolina Constitution.

## II.    The district court erred in granting summary judgment on Devonte's conditions of confinement claim under the Eighth Amendment.

The Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citations omitted). Prison Officials "must provide humane conditions of confinement . . . must ensure that inmates receive adequate food, clothing, shelter, . . . and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984).

The Supreme Court prescribes a two-part test for when conditions of confinement violate the Eighth Amendment. *Farmer*, 511 U.S. at 834. The objective prong requires the inmate to demonstrate a "substantial risk of serious harm," while the subjective prong requires that the inmate demonstrate that the Prison Official knows of and disregards the risk of harm. *Id*.

## A. The deprivation that Devonte was subjected to was severe enough to reach objective constitutional dimensions.

Based on Plaintiffs' evidentiary forecast, Devonte was subjected to unjustified pain that reached constitutional dimensions with respect to the objective prong of the deliberate indifference standard. Moreover, Plaintiffs demonstrated genuine disputes of material fact regarding the objective severity of the conditions alleged, precluding summary judgment.

### 1. Devonte suffered a serious or significant physical or emotional injury.

"Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Demonstrating such an extreme deprivation requires "evidence of a serious or significant physical or emotional injury resulting from the challenged conditions," *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993), or demonstrating a substantial risk of such harm resulting from the prisoner's unwilling exposure to the challenged conditions. *Helling v. McKinney*, 509 U.S. 25, 31(1993). Moreover, this Court in *Strickler* acknowledged that in an "extraordinary case of a palpable deprivation of the minimal requirements of civilized existence . . . an inference of serious injury might be reasonable." 989 F.2d at 1381-1382.

In this case, Devonte was a 22-year-old man who was told by doctors his death was imminent, yet he had to withstand the emotional pain of being forced to urinate in a cup in front of family and guards while chained to the bed despite the availability of an in-room bathroom; he was forced to eat quickly or lose the privilege of eating at all; he had to endure a blaring television turned up for the purpose of harassment; he was shackled to his bed during all meals, throughout the night, and while urinating in front of guards and family. These circumstances, by themselves, created a question of fact regarding the existence or risk of a serious and significant emotional injury to the Plaintiff because all of them occurred while Devonte's body was being steadily ravaged by an obvious, painful, and deadly infection. *See Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996) ("[W]e have specifically recognized that the objective component can be met by 'the pain itself,' even if an inmate has no 'enduring injury.'") (quoting *Norman v. Taylor*, 25 F.3d 1259, 1263 n.4 (4th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1114, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995)). Derrick Coleman testified that he saw his dying son "just straight up being embarrassed and humiliate[ed] . . . in front of [his family] and there was nothing [they] could do about it." JA097. Here, the emotional injury is palpably obvious and the antecedent conduct falls shamefully below the minimal requirements of civilized existence.

Defendants and the district court seized on the idea that because Devonte was going through his end-of-life experience, that subjecting him to the conditions alleged here created a complex causal knot that only expert testimony could hope to untie. JA261-262.

First, in the Fourth Circuit, there "is no requirement . . . that a plaintiff alleging [an Eighth Amendment claim] present expert testimony to support his allegations of . . . [a] substantial risk of serious injury." *Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016). Moreover, the severity here is not found in clinically separating the emotional pain of dying from the emotional pain of being abused while dying. As explained above, the severity here is found in the apparent and conscious-shocking actions of the Defendants and the reasonable inference that such conduct would result in severe emotional pain or the risk thereof.

Second, understanding whether Devonte endured or faced a substantial risk of serious injury is within the purview of the jury without expert testimony. *See e.g.*, *Id.* (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962) ("When laypersons are just 'as capable of comprehending the primary facts and of drawing correct conclusions from them' as are experts, expert testimony may properly be excluded."); *Wilkerson v. Stalder*, 639 F.Supp. 2d 654, 680 (M.D. La. 2007) ("Any person in the United States who reads or watches television should be aware that lack of adequate exercise, sleep, social isolation, and lack of environmental

stimulation are seriously detrimental to a human being's physical and mental health."). This Court has held that a jury is capable of understanding by lay intuition, unaided by expert testimony, the risks of failing to provide insulin to a diabetic or the general risks posed by exposure to feces. *See e.g.*, *Jones v. Solomon*, 90 F.4th 198, 209 (4th Cir. 2024); *Scinto*, 841 F.3d at 230. Here, whether Devonte faced a substantial risk of serious emotional harm is less a clinical or scientific question than the impact of insulin on diabetics or the dangers of feces exposure. It is within the lay intuition and rational understanding of a jury to reasonably conclude that being severely mistreated while dying may create a substantial risk of serious harm.

## 2. Under the totality of the circumstances, Devonte was deprived of basic human needs.

In *Rhodes*, *Farmer* and, more recently, *Plata*, the Supreme Court has emphasized that excessive risk to prisoners can stem from multiple interacting structural deficiencies. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (prison conditions "alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities"); *Farmer*, 511 U.S. at 843 (an unreasonable risk of harm sufficient to violate the Eighth Amendment may stem from multiple causes and affect multiple prisoners); *Brown v. Plata*, 563 U.S. 493, 524 (2011) (comparing Eighth Amendment violations regarding prison conditions to a "spider web" because of the interdependence of the conditions that produce the violation and stating that

in such cases "only a multifaceted approach aimed at many causes" will produce a solution).

In a line of cases dealing primarily with overcrowding, the Fourth Circuit adopted the totality of the circumstances as the proper analytical framework for conditions of confinement cases. *Kirby v. Blackledge*, 530 F.2d 583, 587 (4th Cir. 1976); ("The combination of conditions alleged by the prisoners . . . have the cumulative effect of being cruel and unusual punishment . . . [.]"); *Johnson v. Levine*, 588 F.2d 1378, 1380 (4th Cir. 1978) ("Under the totality of all of the circumstances, we conclude that the district judges properly found a constitutional violation warranting judicial direction that the overcrowding be eliminated."); *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) ("In deciding whether conditions at a jail are so onerously burdensome as to reach constitutional dimensions, courts must look at the totality of the circumstances, including the extent to which the restrictions adversely affect the mental or physical health of the inmate."); *Batton v. North Carolina*, 501 F.Supp. 1173, 1179 (E.D.N.C. 1980) ("Prison conditions taken as a whole, may violate the Eighth Amendment if they transgress today's broad and idealistic concepts of dignity, civilized standards, humanity and decency.") (quotations omitted).

Importantly, the individual medical, physical, or psychological circumstances of an inmate can be crucial to the analysis of conditions of confinement because they

constitute part of the totality of the circumstances. *See Farmer*, 511 U.S. 825, 848-49 (Prisoner's transgender status impacted the objective severity and subjective obviousness of the risk to inmate health or safety); *Jordan v. Gardner*, 986 F.2d 1521, 1525-1526 (9th Cir. 1993) (Finding that personal histories of female inmates when combined with policy of cross-gender clothed body searches created conditions of confinement that were cruel and unusual); *LaFaut v. Smith*, 834 F.2d 389, 393-94 (4th Cir. 1987) (Holding that paraplegic inmate was subjected to cruel and unusual punishment where conditions forced him to use ill-suited toilet in his cell and other bathroom facilities provided no privacy, which "was particularly important to appellant in light of the nature of the procedures he had to go through in order to urinate . . . [.]").

Moreover, such individualized circumstances may combine with the general conditions imposed to create a deprivation of constitutional magnitude. *See United States ex rel. Bracey v. Rundle*, 368 F.Supp. 1186, 1191 (E.D.Pa. 1973) ("[C]onditions . . . might all, in different degrees and under a different totality of circumstances, be indicative of punishment in violation of the Eighth Amendment."); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (Reasoning that a combination of conditions may rise to the constitutional dimension where "they have a mutually enforcing effect that produces the deprivation of a single, identifiable

human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.").

Here, the district court erred in failing to adequately consider the totality of the circumstances, which necessarily and importantly included Devonte's terminal illness. In terms of the example provided in *Wilson*, Devonte's illness, to a greater degree, was like the low cell temperatures at night because it was a naturally occurring risk to health and safety that could be exacerbated and combined with other conditions to create a specific deprivation reaching constitutional dimensions. It is not cruel and unusual to be refused a blanket – until the temperature drops below freezing.

Similarly, being forced to urinate in a cup while shackled, being deprived of food if not eaten quickly enough, and having to endure a blaring television may not be cruel and unusual standing alone. However, forcing these conditions on a 22-year-old man who has been recently diagnosed with a terminal, fungal infection that disfigures his face and kills his organs on its final march to his brain, is absolutely a deprivation of civil human needs. Devonte was forced to comprehend that he was going to die in the first quarter of his natural life, and while he was in pain and trying to process end-of-life (which was known to all), NCDPS officers felt it necessary to accompany that pain by using unnecessary restraints, along with ridiculing, harassing and embarrassing Devonte (a person who posed no threat to anyone). In

total, these conditions have no place in a civilized society, and the Court should not allow these individuals to hide behind immunity and lost hospital logs that would and could have identified them.

Here, by isolating and attacking each individual facet of the deprivations in a vacuum and by doing so without considering the significance of Devonte's illness as part of the totality of the circumstances, the district court misapplied the conditions of confinement analysis. In terms of the *Wilson* example, the district court in this case analyzed whether refusing a blanket reached constitutional dimensions without considering the impact that cold cell temperatures have on the equation. Furthermore, in this piecemeal analysis, the district court overlooked genuine disputes of material fact concerning the deprivations alleged as discussed below.

Similar to the inmates in *Jordan*, *LaFaut*, and *Farmer*, Devonte's particular medical and psychological circumstances substantially impacted the severity of the conditions that were imposed upon him. Like the female inmates in *Jordan*, whose experiences of abuse made them particularly susceptible to emotional pain via cross-gender searches "even if properly conducted," Devonte's illness when combined with the official policies of Defendant Lassiter, even if properly followed, subjected Devonte to particularly foreseeable and severe emotional pain due to his status as a

terminally ill inmate. 986 F.2d at 1525. This remains true for the acts of the individual guards that were not done pursuant to official policies.[1]

Like the inmate in *LaFaut*, whose physical disabilities combined with other conditions to impose needless challenges and embarrassment associated with simply using the restroom, Devonte was subjected to conditions that, combined with his debilitating illness, transformed simple acts like relieving himself, attempting to sleep, or attempting to eat into substantial sources of emotional pain, humiliation, and needless embarrassment.

### i.   Forcing Devonte to urinate in a cup while chained to the bed.

Adequate access to bathroom facilities is a human need. *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (stating that "deprivation of bathroom breaks . . . create[s] a risk of particular discomfort and humiliation[.]"). Requiring a terminally ill inmate to remain shackled to his hospital bed while relieving himself in a cup despite the availability of an in-room restroom does not provide access to adequate bathroom facilities and rises to the constitutional dimension, particularly where, as here, Devonte was required to urinate in this way in the presence of his family and various guards. While the district court found that requiring Devonte to urinate in this fashion was a policy of NCDPS, Defendants produced no such written policy.

---

[1] Deposition testimony revealed substantial discord among the guards as to whether forcing Devonte to urinate in a cup while chained to the bed was an official policy/ custom or not.

JA256. Further, Edward Thomas, the warden of Central Prison during the time Devonte was in the hospital, testified that if this behavior had been brought to his attention, he would have taken investigative and corrective action against the guards responsible. JA445-447.

Here, the conditions imposed on Devonte were similar to the Plaintiff in *LaFaut*, whose paraplegic status combined with the conditions imposed to cause wanton pain, including emotional pain due to lack of privacy and having to use ill-suited facilities despite the availability of proper facilities. 834 F.2d at 389. By forcing Devonte, a terminally ill inmate, to urinate while shackled to his hospital bed in front of guards and family despite the availability of an in-room restroom just feet away, the prison officials here imposed unnecessarily embarrassing, challenging, and emotionally painful conditions that served no penological end and robbed Devonte of humanity and dignity. *See Karn v. PTS of America,* LLC, 590 F.Supp. 3d 780, 815 (D.Md. 2022) (Holding that inmate met objective prong of conditions of confinement claim where he was denied adequate bathroom opportunities, requested bathroom access, and was forced to urinate into a bottle); *See also Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (Stating that "involuntary exposure of a [prisoner's genitals] in the presence of people of the other sex" could violate the Eighth Amendment when such exposure is "not reasonably necessary.").

Plaintiffs demonstrated genuine issues of material fact with respect to this deprivation. In their depositions and affidavits, Tangy Coleman and Derrick Coleman testified that they saw Defendants Royal, Burt, Ward, Oliver, McLamb, and Salas force Devonte to urinate in this way. JA464-471, JA450-452. Defendant Salas admitted that she could have forced Devonte to urinate in this fashion. JA440. Defendants Royal, Burt, Ward, and Oliver denied these allegations during their depositions. JA389-390, JA438, JA428, JA432-434. In her declaration submitted to the district court, Officer Diggs did not deny forcing Devonte to urinate in the fashion described above. JA175-178. Therefore, Plaintiffs have presented a genuine dispute of material fact requiring a factfinder to weigh the competing testimony. Such a fact dispute cannot be properly resolved at summary judgment because a jury must weigh the testimony. *See e.g.*, *Anderson*, 477 U.S. at 249, ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2 (2004) (*per curiam*) (Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment).

### ii.      Discarding Devonte's food if not eaten fast enough.

Denying a terminally ill inmate the opportunity to eat food unless eaten quickly and requiring that same dying inmate to remain shackled while attempting

to eat quickly enough to avoid having the food taken away, rises to the constitutional dimension, particularly in circumstances like Devonte's, where these humiliating, unsafe, and unwarranted measures were sometimes undertaken in the presence of his family. For Devonte, the conditions of requiring a terminally ill patient to remain shackled and eat quickly or not eat at all had no rational or medical basis, and deprived Devonte of constitutionally required nutrition. This is particularly true in the case of a terminal inmate who may not be able to eat quickly due to such conditions. Moreover, having to endure such conditions both while under the severe stress of a final illness and in the presence of family falls short of the "broad and idealistic concepts of dignity, civilized standards, humanity, and decency" embodied in the Eighth Amendment. *Estelle*, 429 U.S. at 102 (quotations omitted).

Prisoners have the right to nutritionally adequate food. *Wilson v. Johnson*, 385 Fed. Appx. 319, 320 (4th Cir. 2010); *Bolding v. Holshouser*, 575 F.2d 461, 466 (4th Cir. 1978). While courts have held that limiting the time for inmates to eat meals may not reach constitutional severity, Plaintiffs are not aware of any case where limiting the time for a terminally ill inmate to eat their food has been held *not* to reach constitutional levels. In *Wilson*, this Court held that an inmate adequately stated a conditions of confinement claim where the inmate lost weight and experienced stress as a result of being underfed on a daily basis for a period of one month. 385 Fed. Appx. at 320. Here, Plaintiffs forecasted evidence that Devonte was

denied adequate nutrition on a regular basis for approximately three months in a controlled hospital setting. As explained above, the severity and likelihood of emotional and physical injury was heightened in Devonte's case because of the circumstances under which he was deprived of nutrition–his final illness, impending death, and the presence of his family. Moreover, similar to *Wilson,* Derrick Coleman testified that Devonte was losing weight rapidly. JA094.

The district court erred by misapplying the standard for summary judgment with respect to the Plaintiffs' evidence concerning the extent and severity of this deprivation. In determining whether a movant shows that there is no genuine issue as to any material fact, a court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Proper application of this standard shows that Plaintiffs demonstrated a genuine dispute of material fact. The district court found that because Derrick Coleman testified that he saw Deanise Royal discard Devonte's food and because Derrick was only allowed to visit the hospital once per week during the months of June and July, then it follows that "*[a]t most*, Plaintiffs have presented evidence that Devonte was denied sufficient time to finish his meals once a week." JA258 (emphasis added). However, taking the facts and inferences in the light most favorable to Devonte's estate, Plaintiffs presented evidence that *at least*, Devonte was denied sufficient time to finish his meals on the occasions witnessed by Derrick Coleman–not *at most*.

Because Derrick Coleman was not permitted in the hospital room during all meals with his son, the inference should not end at what he observed–it should begin there.

The inference that must follow under the summary judgment standard is that Devonte continued to miss meals when his father was not present during the three months he was in the hospital. Viewed in the appropriate light, Plaintiffs' evidentiary forecast is sufficient to overcome summary judgment with respect to the objective severity of the nutrition deprivation. Moreover, because Derrick and Tangy were able to identify Officer Royal as one of the guards who discarded Devonte's food if not eaten fast enough and since Officer Royal testified that she did not engage in such behavior, Plaintiffs presented a genuine dispute of material fact. JA392.

### iii. Blaring in-room television & overtightening shackles.

Blaring the in-room television of a terminally ill inmate and preventing sleep rises to the constitutional dimension, particularly where, as here, the blaring of the television was done without penological purpose and purportedly in retaliation. It is clearly established that "[c]ourts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights." *Tafari v. McCarthy*, 714 F.Supp. 2d 317, 367 (N.D.N.Y. 2010) (citing *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999)).

Derrick Coleman testified that he and Tangy, on several occasions, witnessed the guards in Devonte's hospital room blare the volume on the television in the room,

preventing his terminally ill son from obtaining rest. JA089. Derrick testified that they asked the guards to reduce the volume and they refused. JA089. Derrick testified that he called the assistant warden to complain and that, among the other deprivations alleged, blaring the television was done or continued in retaliation. JA090. These actions created an excessive risk of harm to Devonte, were undertaken without penological purpose, and were particularly painful to Devonte due to the circumstances of his illness. Thus, under the precedent reviewed at length above and under the totality of the circumstances, the blaring of the television was sufficiently severe to reach constitutional dimensions.

Moreover, like the way that overcrowding was analyzed in the above Fourth Circuit cases as a condition that may not be a per se Eighth Amendment violation, the repeated tightening of shackles and requirement that shackles remain on at all times served to exacerbate the other constitutionally impermissible conditions alleged here–further evidencing that those conditions rise to the objective constitutional dimension under the totality of the circumstances. For example, similar to how overcrowding may contribute to unsanitary conditions, Devonte having to remain constantly shackled by overtightened restraints while attempting to finish his food quickly enough or attempting to use the restroom in an already undignified manner, further heightened the severity of the deprivations of nutrition,

sleep, and use of the toilet in a manner compatible with a minimal civilized measure of life's necessities, dignity, and decency.

### B. Plaintiffs forecasted sufficient evidence that Defendants were deliberately indifferent.

Defendants were not entitled to summary judgment on Plaintiffs' Eighth Amendment claims because Plaintiffs' forecast of evidence was sufficient to allow a reasonable jury to conclude that Defendants were deliberately indifferent, satisfying the subjective prong under *Farmer*. An officer is deliberately indifferent when he or she "knows of and disregards" the risk posed by the conditions of confinement. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837).Whether an officer knows "of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . ., and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842.

In this case, the Plaintiffs and the Defendants have provided competing testimony concerning what occurred in Devonte's hospital room. Derrick and Tangy have alleged that they witnessed several individual guards take away Devonte's food, force Devonte to urinate while chained to the bed in the presence of his family despite the availability of an in-room restroom, overtighten his shackles, and blare the in-room television. Various guards deny this treatment. Further, as explained

above, the risks to Devonte's mental and physical health and wellbeing due to these conditions of confinement were obvious. As such, any guard who was aware of Devonte's terminal condition and gruesome physical state yet imposed upon him the above-described conditions causing wanton pain, cannot fairly claim *not* to have been aware of the substantial risk to Devonte's health and safety.

A reasonable jury could find that the Defendant guards—by imposing the specific conditions alleged, despite their actual knowledge of Devonte's obvious condition—were deliberately indifferent because they knew of, yet disregarded, the serious risk of harm. Conversely, instead of taking any measures to abate the serious risk of harm to Devonte, the guards elected to create and exacerbate that risk by imposing the conditions alleged. They did this repeatedly, over the course of several months. Thus, Plaintiffs forecasted a genuine dispute of material fact from which a reasonable jury could conclude that the guards knew of and ignored the objectively severe and obvious deprivations to which Devonte was being subjected. Once again, it is within the purview of the jury—not the district court—to weigh the credibility of testimony.

Here, because Derrick and Tangy witnessed the conduct of Salas, Royal, Oliver, McLamb, Burt, Diggs, and Ward and because those guards denied that conduct, a jury should be allowed to decide which witnesses are credible. *See Karn*,

590 F.Supp. 3d at 815 (Finding that Defendant's contrary contention as to whether inmate was denied bathroom access and required to urinate in a bottle "only serve to demonstrate that there exists a genuine dispute of material fact making summary judgment inappropriate.").

## C. The policies or actions of the individual Defendants inflicted pain without penological purpose.

Plaintiffs' forecast of evidence demonstrated that the deprivations imposed on Devonte were objectively and subjectively unconstitutional. Further, the conditions imposed on Devonte were not necessary for and were grossly disproportionate to the penological interests offered by Defendants to justify them. As such, the pain inflicted on Devonte was wanton pain, inflicted without penological purpose.

Prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347. In *Estelle*, the Supreme Court held that there is a violation of the Eighth Amendment where the actions of prison officials "result in pain without any penological purpose." 429 U.S. at 103. *See also Rhodes*, 452 U.S. at 346. (Holding that among unnecessary and wanton inflictions of pain constituting cruel and unusual punishment forbidden by the Eighth Amendment are those that are without penological justification).

Here, the conditions of confinement to which Devonte was subjected inflicted severe emotional pain without penological justification. The district court found that "each limitation [imposed on Devonte] was based on legitimate penological interests." JA260. However, because Devonte was not simply a hospitalized inmate, the conditions imposed on him were unnecessary and were unreasonably overbroad under the circumstances with respect to servicing the penological interests offered by the Defendants. As such, the relationship between the interests offered and the conditions imposed here was without penological justification and must not shield the Defendants from liability for inflicting unnecessary pain on Devonte.

During the time that Devonte was subjected to the conditions complained of, he was obviously suffering and dying from a painful and debilitating medical condition which placed him in a physical state whereby it was obvious that Devonte was in no way a physical threat to anyone. JA448, JA170, JA393, JA427, JA429, JA150[2].

Plaintiffs submitted the affidavit and report of their expert in confinement facilities and correctional systems to the district court. JA472-522. Plaintiffs' expert was properly designated and Defendants' neither deposed nor moved to strike the expert report. JA207. Plaintiffs' expert opined that the conduct and practices of the

---

[2] "He was just really weak, and he was hurting and that fungus was just eating him alive, and he was just really weak."

Defendants during Devonte's end of life experience lacked any security, safety, or sound correctional justification or foundation. JA503.

Despite these facts and expert opinions, Defendants contended that the restrictions imposed on Devonte, which applied to all hospitalized inmates irrespective of their medical condition, were justified by the penological interests of preventing assault, escape, introduction of contraband, and limiting physical altercations. D.E. 71, at 9. However, it was obvious to the individual guards who were with Devonte in the hospital that Devonte was not a threat of escape or physical assault. JA437, JA435, JA170. Still, the Defendants imposed conditions on this dying inmate that were similar to those imposed on death row inmates, only with less freedoms. JA442-444, JA202. Thus, while the policies may have been rationally related to the proffered penological interests regarding *some* hospitalized inmates, they were not rationally related to those interests with respect to Devonte because he was obviously dying and not a threat to anyone.

As applied to Devonte who was wasting away from a terminal illness, the policies or independent actions of taking away food before Devonte could finish eating and while he was shackled to the bed and forcing Devonte to urinate in a cup instead of the in-room bathroom in front of his family while shackled to the bed, cannot be said to have been rationally related to preventing him from escaping or assaulting someone. Instead, these policies, in the context of a dying, immobilized,

and nonviolent inmate, who was set to be released in a few months, serve only to inflict wanton pain.

In addition to the evidence of Devonte's debilitating illness, which demonstrated that Devonte was not a threat of escape or assault, Plaintiffs forecasted evidence that Devonte was not violent. Defendants contended that the policies were necessary because Devonte had been convicted of a violent crime and because Devonte had been allegedly involved in an assault in the prison prior to his hospitalization. D.E. 71, at 2. However, Devonte had been convicted of conspiracy and was never involved in a violent incident while incarcerated. JA023, JA199, JA282-297. The alleged assault in the prison occurred on a day when Devonte had a doctor's appointment regarding his illness, involved approximately 20 inmates allegedly beating one other inmate, did not include any video evidence showing Devonte at the scene, included a statement from Devonte where Devonte denied having been involved, and included a statement from the victim of the attack claiming that Devonte had not been involved. JA199, JA283-296, JA311.

Thus, outside of his conviction and during the nearly sixteen months he was incarcerated, Devonte demonstrated no violent tendencies–yet, despite the lack of justification and despite his deteriorating physical state, he was treated unnecessarily as an assault and escape risk. While judges are well advised to leave prison administration to those charged with the unenviable task, prison officials should not

be permitted to justify imposing unnecessary and painful conditions on a nonviolent, dying inmate simply by placing that inmate's name on a list of 20 other names for suspected involvement in an assault without evidence and despite knowledge of contrary evidence. *See Spain v. Procunier*, 600 F.2d 189, 193-194 (9th Cir. 1979) (Kennedy, J.). ("The whole point of the [Eighth] amendment is to protect persons convicted of crimes . . . [.] Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary."). Thus, Plaintiff forecasted evidence precluding judgment as a matter of law that the conditions imposed on Devonte were wanton and inflicted pain without penological purpose.

## III. The district court erred in ruling that the Defendants were entitled to qualified immunity.

Qualified immunity fundamentally concerns itself with "fair notice." *Hope*, 536 U.S. at 739. Government officials performing discretionary functions are generally shielded from liability insofar as their conduct does not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, a Plaintiff must show (1) a violation of a statutory or constitutional right; and (2) that the right at issue was clearly established at the time of the alleged misconduct. *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017). The official is entitled to qualified immunity if the right was

not so "clearly established" that "a reasonable official would understand that what he is doing violates that right." *Thompson*, 878 F.3d at 98 (quoting *Hope*, 536 U.S. at 739).

An official who was deliberately indifferent could not also believe "that [their] actions comported with clearly established law." *Thorpe v. Clarke*, 37 F.4th 926, 939 (4th Cir. 2022). Indeed, because officers must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and actually draw that inference before liability attaches, "it follows that where plaintiffs have made a showing sufficient to demonstrate intentional violation of the Eighth Amendment, they have also made a showing sufficient to overcome any claim to qualified immunity." *Id*. at 934-35 (internal quotations omitted). It is clearly established law that a prison official may be held liable for "deliberate indifference" to a prisoner's Eighth Amendment rights if the official "knows that [the] inmat[e] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 834, 847.

As explained above, the mental state of the officials in this case is not susceptible to resolution as an abstract question of law. Instead, Plaintiffs alleged in their Complaint and forecasted evidence, allowing the reasonable inference that the officers knew their actions inflicted pain on Devonte without penological purpose and posed an excessive risk to Devonte's health or safety under the circumstances.

The evidence demonstrated that the officers, armed with this knowledge, did nothing to abate the risk and conversely, chose to wantonly impose the conditions of confinement that were the very cause of the risk. The evidence demonstrated that these officers came upon a dying and helpless inmate, Devonte Coleman, and utilized their governmental authority to force Devonte to eat quickly while chained with overtightened restraints to his hospital bed or not eat at all; to force Devonte to urinate in a cup, in front of guards and family, despite the availability of an in-room restroom, while chained to his hospital bed by overtightened restraints; and to blare the in-room television in Devonte's hospital room to keep Devonte awake and to inflict pain knowing that he had severe headaches due to his terminal illness.

The district court held that Devonte did not have a clearly established right against "a certain timeframe in which to eat his meals," "not to be guarded and restrained," and "[a] right to visitation, much less contact visits." JA264-265. In framing the Eighth Amendment right at issue, the Defendants argued that Devonte did not have a clearly established right "to desired conditions, outside food, timeframes to eat, not be guarded and restrained while hospitalized, contact visits." D.E. 71, at 18.

Properly framed, the issue here is not whether Devonte had a right to desired conditions, but whether Devonte had a right not to be subjected to conditions of

confinement incompatible with the minimal civilized measure of life's necessities where prison officials were subjectively aware of and indifferent to inhumane treatment creating an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 834, 838; *Rhodes*, 452 U.S. at 347. Because Plaintiffs have shown that there is a genuine dispute of material fact as to the mental state of the officers inflicting the alleged deprivations on Devonte, qualified immunity does not shield the Defendants from liability. *Thorpe*, 37 F.4th, at 934 ("Dismissal, in other words, remains improper so long as the officers' mental state remains genuinely in issue.").

Further, the deprivations alleged and supported by Plaintiffs' forecast of evidence, indicate identifiable and discrete violations of the Eighth Amendment under clearly established law. As demonstrated in Section II above, the Defendants deprived Devonte of clearly established constitutional rights to nutrition, sleep, and relief of his bodily functions in a manner within the parameters of dignity, civilized standards, humanity, and decency.

Even if this Court were to find that the conditions that Devonte was forced to endure were broader than or too dissimilar to the cases relied on by Appellants to support declining qualified immunity, the actions of the Defendants were sufficiently unreasonable and wanton to have placed those guards on notice that they were violating Devonte's right to be free from cruel and unusual punishment. *See*

*Hope*, 536 U.S. at 741("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Camreta v. Greene*, 563 U.S. 731, 741 (2011) ("[C]learly established violations [may] be found when extreme though unheard-of actions violate the Constitution.").

Here, the Defendants knew that Devonte was particularly vulnerable to the conditions they imposed. They knew he was terminally ill, knew he was suffering, knew he was disfigured from his illness, knew he was having headaches making him sensitive to light and sound, knew he was unable to finish meals quickly, knew he could be humiliated by forcing him to urinate in front of guards and family, though it was not penologically warranted. Still the guards forced the conditions complained of despite their knowledge of Devonte's obvious state. Qualified immunity cannot shield such behavior. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (Officials who know of an inmate's particular vulnerability to suicide must not be recklessly indifferent to that vulnerability).

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully pray unto the Court to reverse the order of the district court with respect to Plaintiffs' claims against NCDPS brought under the North Carolina Constitution and Plaintiffs' claims against

the individual Defendants brought under the Eighth Amendment to the United States Constitution, and remand the case back to district court.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request oral argument because it is Plaintiffs' contention that oral argument will be helpful to the Court. This case asks the Court to decide substantial issues of state constitutional law, which are somewhat matters of first impression. Additionally, this case calls on the Court to analyze dispositive issues that have not been authoritatively decided regarding the application of Eighth Amendment precedent to the facts at issue.

Respectfully submitted, this the 12th day of February 2024.

/s/ F. William DeVore, IV
DEVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, North Carolina 28207
(704) 377-5242
will@devact.com

/s/ Brittany N. Conner
DEVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, North Carolina 28207
(704) 377-5242
bconner@devact.com


/s/ S. Cramer Lewis
DEVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, North Carolina 28207
(704) 377-5242
clewis@devact.com


*Counsel for Plaintiff Appellants*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. __23-1986__     **Caption:** __COLEMAN et al v. N.C. DEP'T OF PUB. SAFETY et al__

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

> **Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

> **Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

> **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____10,889____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word _____ [*identify word processing program*] in
14 point, Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) /s/ F. William DeVore, IV _____

Party Name __Coleman et al__ _____

Dated: __2/12/2024__ _____

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that a copy of the foregoing document was filed through ECF and thereby, will be served upon Defendants-Appellees via email as follows:

Alex R. Williams
North Carolina Department of Justice
(919) 716-6528
114 W. Edenton St.
Raleigh, NC 27603
awilliams@ncdoj.gov

*Attorney for Defendants – Appellees*

This the 12th day of February, 2024.

DEVORE, ACTON & STAFFORD PA

/s/ F. William DeVore, IV
F. William DeVore, IV, NC State Bar No. 39633
438 Queens Road
Charlotte, North Carolina 28207
Telephone: (704) 377-5242
Facsimile: (704) 332-2825
wdevore@devact.com
*Attorney for Plaintiffs - Appellants*